UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

RANDALL JASON MCCARTER,    )
                          )
        Plaintiff,        )
                          )
v.                        )          No. 3:20-CV-483-DCP
                          )
UT-BATTELLE, LLC,         )
                          )
        Defendant.        )

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the
Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,
including entry of judgment [Doc. 12].

Now before the Court are Plaintiff's Motion for Partial Summary Judgment [Doc. 18] and
Defendant's Motion for Summary Judgment [Doc. 20]. The motions are ripe and ready for
adjudication. Accordingly, for the reasons explained below, the Court **DENIES** Plaintiff's motion
[**Doc. 18**] and **GRANTS IN PART AND DENIES IN PART** Defendant's motion [**Doc. 20**].
Specifically, the Court enters summary judgment in favor of Defendant on Plaintiff's failure to
accommodate claim and retaliation claim. The Court declines to enter summary judgment on a
disparate treatment claim as Plaintiff has not alleged such a claim.

## I.    BACKGROUND

This suit arises out allegations of religious discrimination for failure to accommodate and
for retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e, *et seq.* ("Title VII"). The following facts are undisputed, unless noted otherwise.

Plaintiff has worked as a security police officer ("SPO") for several private employers who were under contract with the Department of Energy ("DOE") since 2008. On December 31, 2018, Plaintiff became a protective force officer ("PFO") with Defendant at the Oak Ridge National Laboratory ("ORNL") after his previous employer lost the security contract.[1] Plaintiff's job duties include protecting special nuclear material with the duty to engage in pursuit and to use deadly force [Doc. 21-1 p. 79]. He also has authority to make a citizen's arrest for theft of DOE property [*Id.*].[2] DOE owns the uniforms and tactical equipment worn by the PFOs [*Id.* at 3]. Stephen Macklin ("Macklin"), the Protective Force Group Leader at ORNL during the relevant time period, testified that Defendant continued the policies of the previous security contractor, including the appearance policy [*Id.* at 141]. Macklin claims, however, that he received complaints regarding certain patches worn by the PFOs [*Id.*]. Macklin stated that the complaints were not directed at any religious patches, but instead directed at "morale patches" and specifically, a patch that said, "Armed Infidel." [*Id.* at 4 & 141]. Macklin stated that he continued to receive complaints about offensive patches, so he had to take action to eliminate patches that could be considered offensive [*Id.* at 141]. Jeff Smith, the Deputy Laboratory Director for Operations, reported to Jimmy Stone ("Stone"), the Associate Laboratory Director, Facilities & Operations Directorate at ORNL, that there had been complaints about the patches and that some of the complaints concerned the display of the Christian flag [*Id.* at 4].

---

[1]     In some instances, the parties refer to Plaintiff's job title as a "security police officer," and in other instances, the parties refer to Plaintiff's job title as a "protective force officer." Both descriptions are accurate [Doc. 21-1 p. 47]

[2]     The Atomic Energy Act authorizes DOE to contract with Defendant for armed Protective Force Officers. 42 U.S.C. § 2201(k). The statute grants Protective Force Officers the authority to make certain arrests without a warrant. *Id.*

2

On June 6, 2019, Defendant distributed a Memorandum ("June 6 Memorandum") to all protective force department personnel [*Id.* at 152]. The purpose of the June 6 Memorandum was "to provide information to the department on upcoming operational changes and clarifications on already established policies" [*Id.*]. The June 6 Memorandum stated, in relevant part, as follows:

1. Effective June 17, 2019[,] the only patch which is authorized on the Tactical Vest will be DOE marked on the back, a black/silver Protective Force Shield on the back and front and the Supervisors Rank insignia. No other patches, flags, pins, or insignias are authorized.

(hereinafter, the "Policy") [*Id.*].

Prior to the PFOs proceeding to their assigned post, they attend a guard mount meeting, which is a daily briefing [*Id.* at 83]. Plaintiff took a vacation on June 8, 2019, so he first learned of the Policy during the guard mount meeting on June 20, 2019 [*Id.* at 95–96]. Captain Gary Johnson ("Captain Johnson") explained the Policy to the PFOs, stating that they were no longer authorized to wear anything that is not company issued on the vests or uniforms [Doc. 19-4 p. 3]. Captain Johnson specifically mentioned patches with religious symbols and American flags, and "any items that's not company issue[d]" [*Id.*]. Captain Johnson looked around the room to see if any of the PFOs were wearing patches, because in the past many of them wore the American flag [*Id.* at 4]. Captain Johnson testified that he did not see anyone wearing any patches, except Plaintiff, who was wearing the Christian cross [*Id.*]. Captain Johnson told Plaintiff that he could no longer wear his patch and that he needed to take it off [*Id.*]. In response, Plaintiff requested a religious accommodation and began asking questions about the rules and regulations with respect to his patch [*Id.* at 5]. Captain Johnson testified that he is not an expert about those issues, so he told Plaintiff that as a captain he is required to enforce company rules and regulations [*Id.* at 6]. Captain Johnson told Plaintiff to take off the patch and that if Plaintiff had any issues or complaints,

he could file a grievance with the union or make an official complaint so that they could address it later [*Id.*]. Plaintiff asked Captain Johnson if he was planning to send Plaintiff home, and Captain Johnson responded that he was not going to send Plaintiff home at the time [*Id.*].

Plaintiff testified that during the June 20 guard mount meeting, he asked Captain Johnson if the new policy required that Christian cross patches be removed, and Captain Johnson responded in the affirmative [Doc. 21-1 p. 88]. Plaintiff requested a religious accommodation, and Captain Johnson did not appear to understand Plaintiff's request [*Id.*]. Plaintiff does not recall Captain Johnson telling him to file a grievance [*Id.*].

After the guard mount meeting, Plaintiff proceeded to his post [*Id.* at 89]. Meanwhile, Captain Johnson talked to Major Roxanne Pilgrim ("Major Pilgrim") about the situation [Doc. 27-1 p. 5]. Major Pilgrim told Captain Johnson that Plaintiff needed to remove his patch [*Id.*]. Major Pilgrim called Lieutenant Geraldo Blair ("Lieutenant Blair") and instructed him to have Plaintiff surrender his patch [*Id.* at 4]. Within a few minutes of Plaintiff arriving at his post, Lieutenant Blair told Plaintiff that Major Pilgrim instructed him to direct Plaintiff to remove the patch [*Id.* at 90]. Plaintiff would not remove the patch and told Lieutenant Blair that if Major Pilgrim wanted Plaintiff to give up the patch, she needed to ask Plaintiff herself and not send someone else to instruct him to do so [Doc. 21-1 p. 91]. Plaintiff testified that he was simply seeking clarification from the person in charge, which was Major Pilgrim [*Id.*]. Plaintiff attempted to call Major Pilgrim but could not reach her [*Id.* at 94]. Plaintiff called Captain Johnson, who stated that Major Pilgrim was with him, and he confirmed that Major Pilgrim had given the order to remove the patch [*Id.*]. Plaintiff told Captain Johnson that if Major Pilgrim wanted to take his patch, she could do so and that she could also send him home [*Id.*].

4

According to Macklin's testimony, after the above incident, Major Pilgrim called him [*Id.* at 145]. Major Pilgrim reported to Macklin that Plaintiff refused to remove his patch and demanded to talk to her [*Id.*]. Macklin told Major Pilgrim that there appeared to be a lot of emotion and stress as a result of what occurred and that they all just needed to diffuse the situation as it was not a life-and-death matter that they needed to worry about [*Id.*]. Macklin told Major Pilgrim that Plaintiff could wear his patch on his vest and that they could sort it out the following day [*Id.*]. Macklin stated that Plaintiff also called him, and Plaintiff explained that under Title VII, he had a right to a religious accommodation [*Id.* at 145–56].[3] Macklin told Plaintiff that he was not familiar with any of that [*Id.*]. Macklin explained to Plaintiff that he had received complaints and that they needed to make sure that they were expressing a neutral image [*Id.*].

Per Plaintiff's testimony, he advised Macklin of the situation [*Id.* at 94]. Macklin told Plaintiff that he would issue a "stand down" and that Plaintiff could keep the patch on so that Macklin could research the law and discuss with legal counsel [*Id.* at 95]. Plaintiff kept the patch on through his shift [*Id.*].

The following day, Stone told Sam Meacom ("Meacom"), the Chief Steward for the Guards Union, that Plaintiff needed to remove his patch before working the next shift [*Id.* at 5]. According to Plaintiff, Meacom called him to report that Stone stated that Plaintiff better not have the patch on [*Id.* at 95]. Plaintiff testified that it was said in a threatening manner [*Id.*], but Stone and Meacom deny making any threatening comments [*Id.* at 5, 47]. Plaintiff stated he removed the patch to keep things cordial [*Id.* at 95].

Defendant has four levels of discipline: oral reminder, written warning, suspension, and termination [Doc. 19-7 p. 15]. Defendant does not have a progressive disciplinary policy and that

---

[3] Macklin cannot recall the order in which he received the telephone calls [Doc. 21-1 p. 145].

5

depending on the circumstances, any one of the discipline levels could be an appropriate action [*Id.*]. Plaintiff testified that, sometime in late June 2019, he attended a "disciplinary/termination" hearing with Meacom, Macklin, Bill Manuel, who is the Laboratory Protection Division Director, Les Morgan, the Labor Relations Manager, and several unknown females who Plaintiff assumes were with the human resources department [Doc. 21-1 p. 106]. During the meeting, no one told Plaintiff that he would be terminated [*Id.*]. Plaintiff does not recall what was specifically discussed at the meeting, other than they provided a list of things that could happen, including termination, as a result of what occurred [*Id.* at 107]. Following the meeting, Stone decided to issue a written warning [*Id*. at 4]. Specifically, Stone stated:

> I did not ask the Diversity and International Office to convene at Suspension / Termination Review Committee (S/TRC) meeting. Instead, I decided that a written warning would be the most appropriate way of reminding Mr. McCarter of the importance of following orders given to him by supervisors. I knew a written warning would not affect Mr. McCarter's wages, which are governed by the Collective Bargaining Agreement between UT-Battelle and the International Guards Union of America, Local No. 3. I also knew that by itself, a written warning would have no effect on Mr. McCarter's employment benefits, his assignments, or other future job opportunities. One other reason for deciding to give Mr. McCarter a written warning was that I made my decision less than six months after the Protective Force Officers had become UT Battelle employees. I wanted to avoid taking an employment action that might jeopardize labor harmony between UT Battelle and the Union.

[*Id.*]. Stone further stated, "Any security organization expects its employees to promptly obey an order but at ORNL, Protective Force Officers are armed and have access to deadly weapons."

[*Id.*]. In addition, during Macklin's deposition, he explained the following:

> So Security Police Officers are armed. They're authorized to use deadly force. This area that [Plaintiff] was in would have been an area where we are authorized to use deadly force if someone tries to steal the target that they're there to protect. The expectation is that the Security Police Officers display good order and discipline and

6

> follow the orders of their supervisors. Not following orders of
> supervisors is disruptive. Doesn't matter what the order is. It's
> disruptive to the operation because the shift captains and the shift
> lieutenants have a lot to do, especially during this time of staff
> change, trying to do their jobs, and this is disrupting them from
> doing their jobs.

[*Id.* at 149].

On June 26, 2019, Plaintiff received the written warning ("June 26 Written Warning"),
which summarized the events that occurred on June 20, 2019 [*Id.* at 132–33]. The June 26 Written
Warning concludes:

> To impress on you the seriousness of your unacceptable conduct this
> written warning is being issued. Your failing to comply with
> Company policy, failing to follow supervisory instructions and
> being disruptive to efficient operations is unacceptable and will not
> be tolerated.
>
> It is hoped you will take this opportunity to reflect on your
> unacceptable conduct that has resulted in this disciplinary action as
> a failure to comply with Company policy, following supervisory
> instructions, and disrupting efficient operations may result in further
> discipline up to and including termination.

[*Id.* at 132]. Plaintiff acknowledges that the June 26 Written Warning has not resulted in lost
wages or his ability to take short-term disability, but it has caused him extreme stress [*Id.* at 103–
104]. On July 12, 2019, Plaintiff also asked his union to grieve the written warning [*Id.* at 98;
Doc. 26-8 p. 2].[4]

On September 13, 2019, Plaintiff addressed a letter to the HR manager ("September 13
Letter") [Doc. 21-1 pp. 134-33].[5] The September 13 Letter states that Plaintiff made a verbal

---

[4]   The parties do not brief in detail what happened during his grievance, *see* [Doc. 19 p. 2
("McCarter's union grieved the discipline and met with various leaders of management without
resolution of the discipline grievance.")]; [Doc. 21 p. 8 ("McCarter asked his union to grieve the
written warning")].

[5]   Plaintiff signed the letter at the bottom and dated it September 16, 2019 [Doc. 25-6 p. 6].

request for a religious accommodation on June 20, 2019, and because he did not receive a response from management, he made a second request for a religious accommodation [*Id.* at 134]. Plaintiff states that management has not acknowledged his request, although required to do so under federal law [*Id.*]. Plaintiff submits that this is his third request and that he "formally request[s] UT-Battelle management to allow me to wear the patch of my Christian faith – or come to some agreement between us regarding my accommodation" [*Id.*]. Plaintiff discusses his Christian beliefs and provides case law regarding companies that did not accommodate religious beliefs [*Id.*]. Plaintiff states that he understands Defendant does not need to accommodate his request if it presents an undue hardship, but his accommodation does not do so [*Id.* at 135].

Deborah Bowling ("Bowling"), the Diversity and International Office Director, became aware of Plaintiff's request for a religious accommodation in September 2019 [Doc. 25-5 p. 6]. Bonnie Herbert, who was the HR manager at the time, and Les Morgan, asked Bowling to meet with Plaintiff [*Id.*]. Bowling and Pat Bocian, the Director of Labor Relations, met with Plaintiff on November 14, 2019 [Doc. 26-8 p. 7].[6] According to Bowling's notes to the file, the November 14 meeting was to engage in the interactive process with Plaintiff, who stated that he wanted to wear a patch on his uniform showing his Christian faith [*Id.*]. Bowling informed Plaintiff that Defendant had a policy that all security force personnel/guards should keep an appearance of neutrality and impartiality and that the standardization of uniforms is important [*Id.*]. Bowling stated that the only patch Plaintiff was allowed to wear was the official DOE security patch [*Id.* at 8]. Bowling's notes regarding the meeting state as follows:

> I referred to his letter in which he states he would like to come to an agreement on what he can wear, and we were there to do just that. He agreed and we discussed several options including wearing a cross necklace or a patch on his t-shirt. [Plaintiff] indicated he was open to options and asked about wearing a pin or decoration on a

---

[6]     The parties do not explain Pat Bocian's job title.

lanyard. [Plaintiff] was not wearing a lanyard; his badge was clipped onto the front of his tactical vest. He said he didn't wear the lanyard, but others do.

[*Id.* at 9]. Bowling stated that they spoke for over thirty (30) minutes and agreed to consider options and to meet again on December 12, 2019 [*Id.* at 8]. In the meantime, Bowling met with management to determine what would be acceptable for Plaintiff to wear [*Id.*]. Management reiterated that the uniform must be neutral and have the appearance of impartiality [*Id.*]. Management stated that there is no restriction on jewelry as long as it does not interfere with the uniform [*Id.*]. Management had safety concerns regarding a lanyard because it could inhibit an officer's ability to easily access his gear on the tactical vest [*Id.*].

On December 12, 2019, Bowling, Paula Cogdill,[7] and Plaintiff met to discuss accommodations [*Id.*]. Bowling's notes to the file provide the following:

> Jason, Paula, and I met. I recapped our meeting from before where we met to discuss his accommodation request and talked about options for him to show [h]is Christian faith, and that this was the follow up to that meeting. I reiterated to [Plaintiff] that the guards needed to have an appearance to the public of neutrality and impartiality as we discussed before, and for that reason, he would not be able to wear extra patches on his uniform, he could however, wear jewelry. If he wanted to wear a cross necklace, ring or bracelets to show his faith, that would be fine. The necklace would need to be tucked under his tactical vest to keep the look of neutrality to the uniform, and so that the necklace would not get in the way of his ability to access his gear. He could wear a bracelet or a ring with a cross or other symbol of faith. He could also wear a patch on his t-shirt under his uniform.
>
> [Plaintiff] asked about wearing a patch or pin on his lanyard. I said no, he needed to keep the appearance of neutrality and impartiality. [Plaintiff] was not wearing a lanyard; his badge was clipped to the front of his tactical vest.
>
> At that time, [Plaintiff] said, well, I guess we are done here. He stood up, shook our hands, and left.

---

[7] It appears to the Court that Paula Cogdill worked in the human resources department [Doc. 22 p. 146].

[*Id.* at 9]. Bowling further testified that Plaintiff asked about a lanyard, and Bowling replied that a lanyard was not an option at this time, but there were other available options [Doc. 21-1 pp. 56–57]. Bowling stated that Plaintiff got up, said they were done, and walked out [*Id.*].

Plaintiff testified that he turned down the offer to wear a patch on his t-shirt because the patch would not be visible [*Id.* at 112–113]. Plaintiff stated that Bowling also offered a ring or bracelet, but Plaintiff thought those were not acceptable because the cross would be too small to be seen on a ring or bracelet [*Id.* at 113]. He explained that in order to be visible, the ring or bracelet would need "to be large and gawky," which would possibly become a safety issue because of getting caught on something [*Id.* at 113-114]. Plaintiff testified that Bowling offered a necklace with a cross on it, but Bowling stated that the cross could not be showing, and it must be tucked into his shirt [*Id.* at 114–15]. Plaintiff stated he was going to accept the necklace as an accommodation until Bowling said that the cross had to be hidden [*Id.* at. 115]. Plaintiff testified that he asked about a lanyard because other SPOs wore lanyards displaying logos for sports teams [Doc. 21-1 p. 99–100]. Plaintiff testified that Bowling stated that while employees wear different types of lanyards and lapel pins, a lanyard with a cross was not allowed [*Id.* at 114]. Plaintiff points out that according to Defendant's policy issued May 13, 2019, "The wearing of a lanyard is preferred, but a minimum, lanyards must not be offensive and must contain a safety release mechanism." [Doc. 19-7 p. 10].

## II.    POSITIONS OF THE PARTIES

As mentioned above, Plaintiff alleges religious discrimination for the failure to accommodate and retaliation in violation of Title VII. Plaintiff moves for partial summary judgment on his claim for failing to reasonably accommodate his religious beliefs and practices.

In his brief [Doc. 19], Plaintiff claims that the undisputed facts demonstrate a prima facie case of religious discrimination and that Defendant failed to meet its burden to provide a reasonable accommodation without undue hardship. Plaintiff states the undisputed material facts establish that (1) he held a sincere religious belief and practice, specifically that he needed to display the cross; (2) his sincere religious belief and practice conflicted with an employment requirement, as set forth in the Policy; (3) he informed Defendant of the conflict between his sincere religious belief and practice and Defendant's employment requirements; (4) he was disciplined for failing to comply with the conflicting employment requirements; and (5) Defendant failed to meet its burden to show that it could not provide a reasonable accommodation without undue hardship. For those reasons, Plaintiff asserts that he is entitled to partial summary judgment on his religious discrimination claim.

Defendant filed a response [Doc. 23], arguing that Plaintiff's motion for partial summary judgment should be denied. Defendant asserts that (1) there are material facts in dispute as to whether Plaintiff has a sincerely held religious belief that he must visibly display a Christian cross; (2) Plaintiff's allegation that he was "disciplined" is unsupported by Sixth Circuit precedent; (3) Plaintiff failed to cooperate with Defendant in the search for a reasonable accommodation for his beliefs, meaning that Plaintiff's argument that Defendant did not provide a reasonable accommodation fails; and (4) Plaintiff ignores Defendant's undue hardship arguments and the evidence on which those arguments are based. Thus, Defendant contends Plaintiff's motion for partial summary should be denied.

Plaintiff filed a Reply [Doc. 23], reasserting that the undisputed facts establish that he had a sincerely held religious belief, that Sixth Circuit precedent supports a finding that he was

disciplined by Defendant, that Defendant failed to offer a reasonable accommodation, and he did not fail to cooperate with Defendant in determining such an accommodation.

Defendant filed a Motion for Summary Judgment [Doc. 20], contending that there are no genuine issues of material fact and that Defendant is entitled to summary judgment as a matter of law on Plaintiff's claims. Defendant argues Plaintiff cannot establish a prima facie case on his failure to accommodate claim because he cannot demonstrate that he was discharged or disciplined for failing to comply with an employment requirement that was in conflict with a sincerely held religious belief. Defendant argues that—in the event Plaintiff has established a prima facie case of failure to accommodate—it is still entitled to summary judgment because Plaintiff's demanded accommodation caused Defendant undue hardship, and Plaintiff cannot demonstrate Defendant failed to attempt to accommodate his beliefs when he left the December 2019 accommodation meeting.

Defendant contends Plaintiff's retaliation claim also fails because he cannot prove that Defendant took a materially adverse action against him. Finally, Defendant argues that—even if Plaintiff has established a prima facie case of retaliation—it is still entitled to summary judgment because Plaintiff cannot establish that Defendant's reasons for the June 26 Written Warning were pretextual.

Plaintiff filed a Response [Doc. 25], arguing that he has established a prima facia case on his failure to accommodate claim because the June 26 Written Warning that Defendant issued was a disciplinary action. Plaintiff contends that the wearing of a Christian cross patch or otherwise wearing a cross would not be an undue hardship for Defendant and that Plaintiff cooperated with Defendant in suggesting several potential accommodations while Defendant offered no reasonable accommodations.

12

As to the retaliation claim, Plaintiff states that he was disciplined by Defendant, thereby satisfying that element of a prima facie case of retaliation; alternatively, Plaintiff argues he has presented a genuine dispute over whether Defendant's actions were materially adverse for purposes of both the failure to accommodate and retaliation claims. Finally, Plaintiff maintains that Defendant's stated reasons for disciplining him were pretextual, allowing the inference that the stated reason was a pretext for a retaliatory motive.

Defendant filed a Reply [Doc. 27], stating that Plaintiff's response, among other things, ignores his own testimony, ignores and misconstrues the Sixth Circuit decisions Defendant relies on to establish that the written warning was not materially adverse, and mistakenly argues that Plaintiff has direct evidence of retaliation. Defendant also asserts that it has already addressed most of Plaintiff's arguments in its response brief [Doc. 23] to Plaintiff's motion for partial summary judgment [Docs. 18 & 19], and so Defendant relies on the arguments in that response as well.

## III.    STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV. ANALYSIS

Plaintiff has moved [Doc. 18] for partial summary judgment arguing that there are no genuine issues of material fact with respect to his failure to accommodate claim. Defendant moves for summary judgment [Doc. 20] on Plaintiff's failure to accommodate claim and retaliation claim. Defendant asserts that Plaintiff cannot show a prima facie case as to either claim.[8] The Court has

---

[8] Defendant also argues that the Complaint did not allege a disparate treatment claim but had Plaintiff done so, Defendant is entitled to summary judgment on that claim [Doc. 21 p. 14]. In

14

considered the parties' positions in this matter and the undisputed facts as summarized above, and for the reasons set forth below, the Court **DENIES** Plaintiff's motion [**Doc. 18**] and **GRANTS IN PART AND DENIES IN PART** Defendant's motion [**Doc. 20**].

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of an individual's religion. 42 U.S.C. § 2000e–2(a)(1).  In order to establish discrimination or retaliation under Title VII, a plaintiff may rely on direct or circumstantial evidence.  *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 346 (6th Cir. 2012).  A circumstantial discrimination claim is evaluated using the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination.  *Id.* at 802.  Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory explanation for its actions.  *Id.* at 803; *see also Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 463 (6th Cir. 2003) (other citation omitted).  If the employer does so, the burden shifts back to the plaintiff to demonstrate the employer's explanation is pretext.  *McDonnell Douglas,* 411 U.S. at 804.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff proves his initial case by direct evidence, the claim is not subject to the *McDonnell Douglas* burden shifting.  *Chattman,* 686 F.3d at 346.  In cases where a plaintiff has submitted direct evidence of discrimination, "the burden shifts to the employer to prove by a

response, Plaintiff states that he has not asserted a disparate treatment claim [Doc. 25 p. 7].  Thus, the Court declines to enter summary judgment on a claim that Plaintiff has not asserted.

preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

With the above analysis in mind, the Court now turns to the claims in this matter.

### A.  Failure to Accommodate

"Courts thus have recognized, as a variant of a religious discrimination claim, a cause of action for an employer's failure to reasonably accommodate an employee's religious beliefs." *Mohamed v. 1st Class Staffing, LLC*, 286 F. Supp. 3d 884, 900 (S.D. Ohio 2017) (citation omitted). "The analysis of any religious accommodation case begins with the question of whether the employee has stated a prima facie case of religious discrimination." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987).  To establish a prima facie case, a plaintiff must demonstrate that he (1) holds a sincere religious belief that conflicts with an employment requirement; (2) has informed the employer about the conflicts; and (3) was discharged or disciplined for failing to comply with the conflicting employment requirement.  *Id.*  If the plaintiff is able to establish a prima facie case, the burden shifts to the employer to show that it could not reasonably accommodate the employee without undue hardship.  *Id.*  "The reasonableness of an employer's attempt to accommodate is determined on a case-by-case basis."  *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1378 (6th Cir. 1994).

Plaintiff asserts that he has established a prima facie case that Defendant failed to accommodate his religious beliefs and that Defendant has failed to show that a reasonable accommodation would impose an undue hardship.  Defendant responds that Plaintiff has not established two elements of his prima facie case—that he held a sincere religious belief and that he was disciplined for failure to comply with a conflicting requirement.  Defendant further argues

that it offered Plaintiff a reasonable accommodation, and Plaintiff failed to cooperate during the interactive process.

The Court finds that Plaintiff has not established a prima facie case of religious discrimination for failing to accommodate.

### 1. Sincere Religious Belief

Plaintiff asserts that there are no genuine issues of material fact that he held a sincere religious belief and practice that he must visibly display the Christian cross. Plaintiff states that Defendant conceded that his beliefs are sincere in its Answer and in its discovery responses.

Defendant disputes that it has conceded that Plaintiff's religious beliefs are sincere. Defendant asserts that Plaintiff's conduct creates a factual dispute over whether he sincerely believed his religion requires him to display a Christian cross and that Plaintiff does not maintain that the Missionary Baptists, his denomination, holds such a belief.

"To ascertain whether an activity qualifies as the kind of religious belief that merits accommodation, courts look to whether the beliefs professed by a claimant are sincerely held and whether they are, 'in his own scheme of things,' religious." *Equal Emp. Opportunity Comm'n v. Publix Super Markets, Inc.,* 481 F. Supp. 3d 684, 699 (M.D. Tenn. 2020) (quoting *Sistrunk v. Camden Cty. Workforce Inv. Bd.*, Civ. No.1:05-cv-1506 (RBK), 2007 WL 1175701, at *3 (D. N.J. Apr. 18, 2007)). The Court may not inquire as to the truth of the belief, but "there remains the significant question of whether it is 'truly held.'" *Publix Super Markets,* 481 F. Supp. 3d at 699 (quoting *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico,* 279 F.3d 49, 56 (1st Cir. 2002)). Such an inquiry is not typically appropriate to determine on summary judgment, unless "the only conclusion a reasonable jury could make is that the employee's religious assertion was not bona fide." *Id.* A plaintiff's credibility is key in

determining the sincerity of a religious held belief, which is a "quintessential fact question" for the jury. *Id.* at 70.

Plaintiff asserts that Defendant conceded this issue in its Answer and in response to discovery as follows:

> 33. Mr. McCarter is a Christian, holding the sincere religious belief and practice that he should visibly display the Christian cross on his person.
>
> Answer: UT-Battelle admits plaintiff maintains he is a "Christian" but denies the sincerity of any belief that a Christian tenant requires adherents to wear a patch with a cross or a Christian flag on a DOE-owned tactical vest.
>
> Request for Admission 5: Jason McCarter's religious belief and practice to display a Christian cross was sincerely held.
>
> Response: Denied as stated. UT-Battelle did not question the sincerity of Mr. McCarter's Christian beliefs but questioned his assertion that those beliefs mandated the wearing of a patch with a cross or a Christian flag on or above the tactical vest.

[Doc. 7 ¶ 33; Doc. 19-6 p. 3]. Plaintiff also points to Defendant's response to an interrogatory, which states, "[W]hile it does not question the sincerity of plaintiff's religious beliefs, it questions whether plaintiff has sincerely held religious beliefs that adherents of his faith must 'visibly display the Christian cross.' Plaintiff has never identified any passage in any biblical passage, verse, or other religious doctrinal writing which requires adherents of the Christian faith to display the Christian Cross on government owned tactical vests, or while working" [Doc. 26-9 pp. 3–4]. Plaintiff argues that Defendant's witnesses conceded the same during their depositions.

The Court does not find that Defendant has conceded this issue. Instead, it appears that the Defendant does not question Plaintiff's assertion that he is a Christian. Whether Plaintiff sincerely believes he must display the Christian cross is different from whether Plaintiff is a Christian. Defendant submits several Facebook photographs of Plaintiff showing that he is not wearing his

18

cross. [Doc. 23-1 pp. 39–40]. When asked why he was not wearing the cross, Plaintiff testified, "Well, sometimes I tend to take it off before I get in the shower[,] and I'll forget it and these are just snapshots in time and -- I mean there is times you do forget things, just like I forget my wedding ring sometimes" [*Id.* at 27].

The Court cannot determine on summary judgment whether Plaintiff's belief that he must visibly display the Christian cross is sincerely held. Instead, the Court finds that this factual question is for the jury to determine.

### 2. Discharged or Disciplined

In order to establish a prima facie case of failure to accommodate, a plaintiff must also establish that he was discharged or disciplined for failing to comply with the conflicting employment requirement. The Sixth Circuit has "declined to relieve a religious accommodation plaintiff of his burden to establish a prima facie case, including the requirement that he demonstrate that he has been discharged or disciplined." *Reed v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 569 F.3d 576, 580 (6th Cir. 2009). "Unless a plaintiff has suffered some independent harm caused by a conflict between his employment obligation and his religion, a defendant has no duty to make any kind of accommodation." *Id.*

The parties dispute whether the June 26 Written Warning constitutes discipline. Plaintiff states that the June 26 Written Warning is labeled "Disciplinary Action—Written Warning." In addition, Plaintiff states that Defendant's employee disciplinary policy defines a "written warning" as one of the four levels of discipline. Plaintiff argues that a warning letter is a form of discipline sufficient to establish this element of his prima facie case [Doc. 19 p. 8 (citing *Jackson v. Longistics Transp., Inc.*, No. 11-2093-STA, 2012 WL 1252543, at *10 n.32 (W.D. Tenn. Apr. 13, 2012) (other citation omitted)].

Defendant responds that it issued a written warning to Plaintiff because he disobeyed three orders to remove the patch from his tactical vest and not because he displayed a Christian cross. Defendant argues that case law supports its position that the June 26 Written Warning is not considered a form of discipline. Plaintiff replies that the cases Defendant cites are not applicable to the present matter.

In *Jackson*, which is cited by Plaintiff, one of the main issues on summary judgment was whether plaintiffs were disciplined or discharged for failing to comply with a conflicting employment requirement. *Id.* at *10. Plaintiffs were practicing Christians who adhered to the Jewish Torah, including observing the Sabbath day, and followed their church's Sabbath mandate, requiring them to refrain from working sundown on Friday to sundown on Saturday. *Id.* at *1. Plaintiffs worked for defendant driving loads and were scheduled to drive a load on the Sabbath, which they refused. *Id*. at *1, *3. Defendant issued plaintiffs a written warning, which stated, "another refusal within a 12-month period will result in your termination of employment." *Id*. Defendant later assigned plaintiffs another load on the Sabbath, and plaintiffs refused to take it. *Id*. The dispatcher instructed plaintiffs to meet with their supervisor before they were assigned additional loads. *Id*. Plaintiffs contended that their supervisor stated that he would accept their resignations, provide good references to any future employer, and would not oppose their attempt to draw unemployment benefits. *Id*. at *4. The court noted that there was some evidence in the record showing that plaintiffs acquiesced to the supervisor's offer. *Id*. at *11.

In determining whether plaintiffs had established a prima facie case for failure to accommodate, the court found that the written warning "constitute[d] discipline for purposes of this element of [p]laintiff's religious accommodation claim." *Id.* at *10. The court relied on the language of the written warning, which explicitly noted that it was a "final warning" and that

"another refusal in a 12-month period will result in your termination of employment." *Id.* (citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994) (holding that a verbal warning and an employee's accumulation of 'absence points' amounted to discipline and satisfied this element of a prima facie case)). In a footnote, the court commented that in a religious accommodation case, a plaintiff must establish that the allegedly aggrieved person was disciplined or discharged, which appears to be different than showing an adverse employment action in race discrimination cases. *Id.* at *10 n. 32. The court noted, "The Sixth Circuit has never considered whether 'any adverse employment action' without actual discipline or discharge could satisfy this element of a religious accommodation case." *Id.* (citation omitted). In any event, the court found that it was unnecessary to reach that issue because the warning letter was a form of discipline. *Id.*

Some courts have distinguished *Jackson*. For instance, in *Lively v. Kroger Co. of Michigan*, No. 2:19-CV-12961, 2020 WL 9258709, at *1 (E.D. Mich. Nov. 20, 2020), *report and recommendation adopted,* No. 19-12961, 2021 WL 791024 (E.D. Mich. Mar. 2, 2021), the court addressed whether a significant incident reminder ("SIR") constituted discipline in the context of plaintiff's reasonable accommodation claim. Plaintiff requested time off to attend a religious convention that defendant originally approved but later denied. 2020 WL 9258102, at *2. Plaintiff did not work on those days, and several other days, and as a result, defendant issued the SIR. *Id.* Defendant claimed that the SIR was not a disciplinary action but a coaching tool to provide positive feedback in addition to assisting employees to avoid future rule infractions. *Id.* The SIR provided to plaintiff established a probational period and noted that another related infraction would result in a "constructive advice record," which defendant did not define. *Id.* Defendant later issued another SIR to plaintiff over a customer complaint but did not assess a probational period. *Id.* Plaintiff filed an EEOC charge for religious discrimination and retaliation alleging, among other

21

complaints, that defendant would not allow her to attend the conference and that defendant issued the SIR when she did attend the conference. *Id*. Plaintiff eventually resigned her employment with defendant, alleging that her experiences of religious discrimination and retaliation constituted constructive discharge. *Id*.

The defendant moved for summary judgment asserting that it never discharged or disciplined plaintiff. *Id*. at *7. The magistrate judge noted, "The answer is not entirely clear whether the warning or probation that [plaintiff] received satisfies the discharge or discipline test." *Id*. The magistrate judge stated that the decision in *Jackson* relied on the Sixth Circuit's decision in *Cooper*, but the Sixth Circuit found no dispute that the plaintiff was disciplined without discussing the facts at length. *Id*. The magistrate judge continued, "And to further distinguish *Jackson*, the [c]ourt must note that the threat of discipline for a subsequent violation was rather harsh: termination. Here, a violation during the probational period results in a "Constructive Advice Record," which presumably does not result in termination." *Id*. at *7. The magistrate judge explained that other courts, including the Sixth Circuit, have held that "activity that does not rise to the level of an adverse employment action cannot rise to the level of discharge or discipline." *Id*. at *8 (citing *Reed*, 569 F.3d at 581 (explaining that the employer's action was not "materially adverse," so it could not be a form of discipline); *McCray v. Fed. Express Corp.*, No. 2:17-CV-2918-JPM-CGC, 2020 WL 4676384, at *11 (W.D. Tenn. Aug. 12, 2020) ("The Sixth Circuit in *Reed* indicated that the concept of "discharge or discipline" is narrower than the concept of 'adverse employment action' for purposes of a standard Title VII discrimination claim.") (other citation omitted)). The magistrate judge found that plaintiff had not established a prima face case because the SIR did not constitute discharge or discipline. *Id*. at *6.

The district judge adopted the magistrate judge's findings, noting, "In the Sixth Circuit, a materially adverse action 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lively*, 2021 WL 791024, at *3 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007)). The court, therefore, adopted the magistrate judge's finding that "the SIR and probationary period did not rise to the level of 'discharge or discipline' for failure to comply with a conflicting employment requirement." *Id*. at *6.

In light of the above, a plaintiff alleging religious discrimination in the context of a failure to accommodate claim must show that the "discipline rises at least to the level of an 'adverse employment action' to meet the 'discharge or discipline' element of the prima facie case." *Mitchell v. Univ. Med. Ctr., Inc.*, No. 3:07CV-414-H, 2010 WL 3155842, at *7 (W.D. Ky. Aug. 9, 2010).[9] The Sixth Circuit has on occasion determined what constitutes an adverse employment action in the discrimination and retaliation contexts. For instance, in *Creggett v. Jefferson Cnty. Bd. of Educ.*, the Sixth Circuit held that plaintiff could not establish his prima facie case for discrimination because he did not put forth sufficient evidence that he suffered an adverse employment action. 491 F. App'x 561, 566 (6th Cir. 2012). In *Creggett*, the plaintiff filed suit against defendant for unlawful discrimination, arguing that he had suffered an adverse employment

---

[9] As explained below, the burden of establishing an adverse action in retaliation claims is "less onerous" than the burden of establishing an adverse employment action in a discrimination claim. *Lively*, 2020 WL 9258709, at *9; *see also Fletcher v. U.S. Renal Care, Inc.*, 240 F. Supp. 3d 740, 752 (S.D. Ohio 2017) ("The burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the discrimination context.") *aff'd sub nom. Fletcher v. U.S. Renal Care*, 709 F. App'x 347 (6th Cir. 2017); *see also Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) ("[T]he Supreme Court made clear in *Burlington Northern* that the requirements for a retaliation claim are in fact considerably less stringent.") (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–69 (2006)).

23

action when defendant gave him a written reprimand. *Id*. at 561. The Court agreed with the district court that plaintiff could not establish he suffered an adverse employment action. *Id*. at 565. The Court explained, "An adverse employment action is defined in this circuit as 'a materially adverse change in the terms of [one's] employment.'" *Id*. (quoting *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 797 (6th Cir. 2004) (other citation omitted)). The Court provided the following examples of adverse employment actions: "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits." *Id*. (other citation omitted). The Court held, "A written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Id*.

The Court finds that the June 26 Written Warning does not constitute discipline. The Court finds that this case is similar to the facts in *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 819 (M.D. Tenn. 2011). In *Norman*, plaintiff filed a claim for race discrimination and submitted a writeup that defendant gave her in support of her prima facie case. *Id*. Defendant's writeup to plaintiff did not indicate that further action was needed, but the writeup stated that "any further infractions could be subject to additional disciplinary action up to and including termination." *Id*. The court held, "The writeup that the plaintiff received does not constitute an adverse employment action." *Id*. at 823 (citing *Hill v. Nicholson,* 383 F. App'x. 503, 509 (6th Cir. 2010) (holding that written counseling was not an adverse employment action because it did not have "any long-term impact on the terms or conditions of [the plaintiff's] employment")). Accordingly, the court found that the writeup was insufficient to establish plaintiff's prima facie case of race discrimination.

There is no dispute in this matter that Plaintiff's wages or terms and conditions of employment have not been affected by the June 26 Written Warning. Plaintiff asserts that the subject of the June 26 Written Warning states, "Disciplinary Action—Written Warning" and that Defendant's disciplinary policy defines a written warning as one of four levels of discipline. The Court finds that such a description does not necessarily require the conclusion that a written warning constitutes discipline in the context of a discrimination claim. *Foust v. Metro. Sec. Servs., Inc.*, 829 F. Supp. 2d 614, 627 (E.D. Tenn. 2011) (finding a final written warning that future violations will result in immediate termination did not result in a significant change in plaintiff's employment status, different responsibilities or benefits, or tangible job consequences, and therefore, was not an adverse employment action for purposes of a prima facie case of age-based discrimination). Plaintiff argues that written warnings remain in an employee's file and may have future ramifications. The potential for future harm, however, is not the standard. Accordingly, the Court finds Plaintiff has not established a prima facie case of failure to accommodate, and therefore, Defendant is entitled to summary judgment on this claim.

**B.    Retaliation**

Defendant moves for summary judgment claiming that there are no genuine issues of material fact with respect to Plaintiff's claim of retaliation. Plaintiff responds that he has presented direct evidence of discriminatory intent. In the alternative, Plaintiff states that he has established a prima facie case of retaliation.

**1.    Direct Evidence**

"For a plaintiff to prevail under a theory of direct evidence of retaliation, he would have to show both 'blatant remarks' revealing the defendant's retaliatory intent and that the retaliatory intent was a motivating factor in the defendant's adverse employment action toward him." *Kostic*

25

*v. United Parcel Serv., Inc.,* 532 F. Supp. 3d 513, 537 (M.D. Tenn. 2021) (citation omitted). "Direct evidence is 'evidence which, if believed, requires the conclusion that unlawful discrimination [or retaliation] was at least a motivating factor in the employer's actions.'" *Hussain v. Highgate Hotels, Inc.,* 126 F. App'x 256, 262 (6th Cir. 2005) (quoting *Sniecinski v. Blue Cross & Blue Shield of Michigan,* 666 N.W.2d 186, 192 (2003)). "Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate (or retaliate) on the basis of some impermissible factor." *Kostic,* 532 F. Supp. 3d at 537–38.

In support of his claim of direct discrimination, Plaintiff cites Macklin's testimony regarding Christian crosses as follows:

> [Stone] said we've got to get rid of them. We've got to eliminate anything that might show some sort of biasness toward any religion. We have to be neutral. And ORNL employs about 564 nationals right now from all walks of life, all religion. And the message was clear to me that we would not present anything other than a neutral image, not favoring any religion over another.

[Doc. 25-2 p. 5]. In addition, Plaintiff states that later, Macklin testified that the "message was clear" in that "any visible display of anything that could be offensive to others needed to be taken care of." [*Id.* at 7]. Plaintiff adds that the June 26 Written Warning stated, "You did not remove the patch instead asserting that displaying the patch was protected under Title VII as a religious accommodation" and "You again did not remove the Velcro patch of a cross, instead intensifying your protest ultimately contacting Steve Macklin by phone to continue your challenge of the Company policy" [Doc. 21-1 p. 132].

The Court does not find that Plaintiff has presented direct evidence of retaliation as Plaintiff's cited evidence would require the Court to make a series of inferences or presumptions to conclude that Defendant unlawfully retaliated against him. *Storrs v. Univ. of Cincinnati,* 271 F. Supp. 3d 910, 932 (S.D. Ohio 2017) ("Stated another way, evidence is direct if it is capable of

26

proving unlawful retaliation 'without any inferences or presumptions.'") (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)). Plaintiff does not point to any blanket remarks or acts that require the conclusion that Defendant retaliated against Plaintiff. When reading the depositions in context, the Court cannot conclude that unlawful retaliation was Defendant's motivating factor as opposed to a concern for the appearance of neutrality. *See* [Doc. 21-1 p. 142 ("We've got to eliminate anything that might show some sort of biasness toward any religion. We have to be neutral.")]; [Doc. 23-1 p. 53 ("I would say my statement was we have to remove anything that shows that we don't have neutrality in the Protective Force.")].

Plaintiff also points to the June 26 Written Warning, which states, in relevant part, as follows:

> After the guard mount meeting Protective Force shift management approached you and informed you that the Velcro patch of a cross did not comply with Company policy and instructed you to remove the patch. You did not remove the patch instead asserting that displaying the patch was protected under Title VII as a religious accommodation.
>
> You again did not remove the Velcro patch of a cross, instead intensifying your protest, ultimately contacting Steve Macklin by phone to continue your challenge of the Company policy.

[Doc. 21-1 p. 132]. Plaintiff asserts that the above statements in the June 26 Written Warning is evidence of direct discrimination as they specifically reference Plaintiff's opposition to a discriminatory policy. Again, the Court finds the above statements insufficient to establish direct discrimination as the letter also references Plaintiff's failure to follow supervisory instructions. To find that such statements establish direct evidence of retaliation, the Court would have to presume that Plaintiff was given the June 26 Written Warning because he asserted his rights under Title VII as opposed to disobeying orders. The Court declines to do so.

### 2. Circumstantial Evidence

Under Title VII, a plaintiff must establish four elements for a prima facie claim of retaliation: "(1) she engaged in a protected activity; (2) her 'exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). The parties only dispute the third element.

It is well established that "Title VII's substantive [antidiscrimination] provision and its antiretaliation provision are not coterminous." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). While a plaintiff alleging discrimination must show conduct affecting the terms and conditions of employment, "a plaintiff seeking Title VII's protection against retaliation need show only 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 569–70 (quoting *Burlington Northern*, 548 U.S. at 67). Thus, the standard for establishing an adverse employment action in a retaliation case, "is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Id.* at 570 (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775–76 (6th Cir. 2018)).

Therefore, the question before the Court is whether a reasonable employee after receiving the June 26 Written Warning would have been dissuaded from making or supporting a charge of discrimination. Defendant argues that several Sixth Circuit cases support its position that the June 26 Written Warning does not constitute an adverse action in a retaliation case. For instance,

recently, in *Davis v. Metro Parks and Recreation Dep't*, the Sixth Circuit determined that the following email (copied in part) was not a material adverse employment action in the context of a retaliation case:

> This is totally unacceptable for a division head to ignore the Director of the Department's instructions. The next incident of any failure on your part to follow my instructions or any failure on your part to fulfill my written instructions will be considered a willful act of insubordination and will be dealt with accordingly.

854 F. App'x 707, 716 (6th Cir. 2021). The Court considered the email to be a "trivial harm" and "one that all employees experience in the workplace." *Id*. (citation omitted). The Court reasoned that plaintiff "was never punished as a result of the written reprimand and, in fact, received a raise during her tenure" and concluded that plaintiff could not establish a prima face case of retaliation. *Id.*

Defendant also relies on *Sensabaugh v. Halliburton*, wherein the Sixth Circuit held that a letter of guidance and a letter of reprimand did not constitute adverse actions. 937 F.3d 621, 628 (6th Cir. 2019). In *Sensabaugh*, plaintiff claimed that defendant retaliated against him in violation of the First Amendment. *Id*. at 624. In addressing whether the plaintiff could establish a prima facie case of retaliation in the context of a First Amendment claim, the Sixth Circuit explained that "a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* at 628 (quoting *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014)). The Sixth Circuit concluded that the letter of guidance was not an adverse action because it "had no detrimental effect" on plaintiff's job, it did not impose any discipline or alter plaintiff's employment, and instead, imposed directives that plaintiff had to follow to avoid discipline. *Id*. In addition, the Court concluded that the letter of reprimand that amounted to a

29

suspension with pay was not an adverse action in light of several panels of the court so holding. *Id.*[10]

The Court finds that Plaintiff's June 26 Written Warning is different than the warnings in *Davis* and *Sensabaugh* because it specifically states that additional actions could result in "further discipline up to and including termination." [Doc. 21-1 p. 132]. However, the Court again finds *Norman* persuasive. In *Norman*, the plaintiff also alleged a retaliation claim. 820 F. Supp. 2d at 819. As explained above, the court found that the writeup, which stated "any further infractions could be subject to additional disciplinary action up to and including termination" was not sufficient to establish an adverse employment action on plaintiff's discrimination claim. *Id*. at 823. The court, however, found that the writeup was sufficient to establish plaintiff's retaliation claim. *Id*. at 824. The court reasoned that "the burden of showing an adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 595–96 (6th Cir. 2007)). The court further explained, "If employees know that they will receive writeups for retaliation for reporting racial discrimination, they might reasonably feel dissuaded from making such reports." *Id.*

The writeup in *Norman* is quite similar to the June 26 Written Warning. In *Norman*, the writeup stated that "any further infractions could be subject to additional disciplinary action up to and including termination," *see id*. at 823, and the June 26 Written Warning states that Plaintiff's failure to comply with certain policies and instructions "may result in further discipline up to and

---

[10] Defendant also cites *Kaminsky v. Wilkie*, 856 F. App'x 602, 607 (6th Cir. 2021) in support of its position. In *Kaminsky*, the Sixth Circuit found that defendant's letter of counseling to plaintiff did not rise to the level of a materially adverse action in context of a retaliation claim. *Id.* The Court, however, did not explain the contents of the letter.

including termination." Accordingly, based on the above, the Court finds that Plaintiff has established a prima facie case of retaliation.

The burden now shifts to Defendant to provide a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden is a burden of production not persuasion. *Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *10 (M.D. Tenn. Apr. 26, 2022) (explaining that a "burden of production means that the defendant merely has to offer admissible evidence adequate to support a finding that the defendant had such a reason" while the "burden of persuasion would require the defendant-movant to show that no reasonable jury could fail to find that the defendant-movant had such a reason"). Defendant has established its burden here, where it submits that it issued the June 26 Written Warning to Plaintiff because he declined to comply with three separate orders from supervisors. *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013) ("We have repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action.").

Given that Defendant has established its burden, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason was pretextual. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (other citation omitted). An employee can establish pretext by offering evidence that "(1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "[T]hese three categories are not the exclusive means by which a plaintiff can show pretext. Rather, they are simply a 'convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Gaulden v. Philips N.*

31

*Am. LLC*, No. 3:20-CV-01002, 2022 WL 1004638, at *14 (M.D. Tenn. Apr. 4, 2022) (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)).

Plaintiff states that Defendant has offered a variety of rationales for disciplining him, which support pretext. [*See* Doc. 25 p. 20 (citing *Thurman v. Yellow Freight Sys. Inc.*, 90 F. 3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.")]. For instance, Plaintiff argues that Macklin accused Plaintiff of being "disruptive to efficient operations," [*see* Doc. 21-1 p. 132] but Plaintiff's immediate supervisor Captain Johnson stated that Plaintiff did not disrupt operations, [*see* Doc. 19-4 p. 11]. Defendant replies that Plaintiff has ignored the evidence and misquoted the testimonies. Defendant argues that *Thurman*, which is cited by Plaintiff, is inapposite from this matter because Plaintiff relies on testimony taken out of context from an employee who was not involved in the decision to issue the June 26 Written Warning. In addition, Defendant argues that showing some inconsistencies in the testimony is not sufficient to establish pretext.

The June 26 Written Warning opens by stating, "We expect all employees to comply with Company policies, follow supervisory instructions, and to avoid conduct that interferes with their job duties. It recently came to our attention you failed to meet these expectations" [Doc. 21-1 p. 132]. It concludes, "It is hoped you will take this opportunity to reflect on your unacceptable conduct that has resulted in this disciplinary action as a failure to comply with Company policy, following supervisory instructions and disrupting efficient operations may result in further discipline up to and including termination" [*Id.*]. Johnson testified, "It didn't disrupt the work operations but it – you know, it did take a little bit of time that, you know, I had for my guard mount time" [Doc. 25-4 p. 7]. The Court does not find that Johnson's testimony establishes that Defendant offered different rationales for its decision or changed its rationale. Johnson was not

the supervisor who decided to issue the written warning and an employee cannot establish pretext by citing to the "various ways in which different supervisors might describe this situation." *Conley v. U.S. Bank Nat. Ass'n*, 211 F. App'x 402, 408 (6th Cir. 2006) ("Regardless of the various ways in which different supervisors might describe this situation, this is not a case, like those Conley relies on, in which the defendant plainly changed its proffered reason for termination."). The Court also notes that the parties do not dispute what occurred that day. The fact that one supervisor characterized the situation differently is not sufficient to show pretext under these circumstances.

The Court also finds Plaintiff's argument that his discipline was no longer justified after Macklin allowed him to wear the cross patch on June 20 insufficient to show pretext. In support of his argument, Plaintiff points to his discussion with Macklin after he declined to remove the cross patch following the exchange during the guard mount meeting and maintains that in allowing him to wear the patch the remainder of his shift, Macklin effectively reversed his subordinates' orders. Plaintiff asserts discipline was no longer justified at that point and became pretext for retaliation. Plaintiff states that the next day, Stone sent the message that he had to remove the cross patch from his vest, and he promptly did so. The Court finds Plaintiff's arguments insufficient for a finding of pretext in light of Macklin's deposition testimony.

Macklin testified that on June 20, 2019, the date of the guard mount meeting where the policy was discussed by Johnson with the SPOs, he received a call from Major Pilgrim and could tell that there was "very heightened emotion" and distress among the supervisors [Doc. 21-1 p. 145]. He stated that Major Pilgrim described to him that Plaintiff was told he needed to remove the patch but that he refused to do so and that she told Johnson to have Blair tell Plaintiff again that he needed to remove the patch but Plaintiff did not remove the patch and demanded to talk with her. Macklin explained that he told Major Pilgrim it was not a "life-and-death situation," the

33

situation just needed to be diffused, and they could handle it the next morning. In the meantime, Plaintiff was allowed to continue wearing the patch on his tactical vest. [*Id.*]. Macklin's testimony describing how he responded to the immediate emotional situation and allowed Plaintiff to continue wearing the patch until the matter could be addressed the following day is insufficient to establish pretext. Further, the fact that Plaintiff eventually complied with Stone's instruction that next day does not change what occurred on the day of the incident and does not establish pretext.

Plaintiff also argues that there was a lack of reasonably informed and considered decision making before Stone decided to discipline him, which establishes that Defendant's reason for the discipline was pretextual. Specifically, Plaintiff asserts the decisional process for the discipline was unworthy of credence because Stone did not review witness statements, he did not talk to any witnesses, and he relied on others who were not present during the incident. Plaintiff denies that his actions caused a significant disruption in the security organization.

Contrary to Plaintiff's assertions, the evidence in the record shows that Macklin called Stone after the incident [Doc. 21-1 p. 146], and that prior to Stone making the decision to issue the June 26 Written Warning, Stone met with Bill Manuel, Macklin's manager; Les Morgan, the Labor Relations Manager; and Macklin [Doc. 27-1 p. 12]. Further, as mentioned above, while the parties dispute how the incident was characterized, there is no dispute in what occurred. Accordingly, the Court finds that Defendant reasonably relied on the particularized facts at hand, and Plaintiff has failed to establish pretext in this regard. *Smith*, 155 F.3d at 807 ("In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

In addressing Defendant's characterization of his assertions of discrimination as disruptive, Plaintiff argues that he "merely objected to discrimination and declined to comply with [Defendant's] policy that conflicted with his religious briefs," and thus, this, too, established pretext [Doc. 25 p. 20]. Plaintiff states that according to the Sixth Circuit, "At the summary judgment stage, we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged insubordination consists of refusing to cease what a jury could find to be reasonable [Title VII] protected activity" [*Id.* (quoting *Yazdian v. Con Med Endoscopic Techs, Inc.*, 793 F.3d 634, 652 (6th Cir. 2015) (other quotation omitted)]. Defendant responds that *Yazdian* is not applicable given that the facts are completely different. Defendant asserts that Plaintiff was insubordinate and the fact that he thought the orders were inconsistent with Title VII does not give him a right to disobey them.[11]

In *Yazdian*, plaintiff filed a complaint alleging retaliation and discrimination in violation of Title VII. 793 F.3d at 644. The Sixth Circuit found that there was sufficient evidence to show that defendant's proffered reason for terminating plaintiff—insubordination and unprofessional behavior—was pretextual. *Id.* at 651. The Court noted that the "district court found that no reasonable jury could find that defendant's stated legitimate reasons were pretextual because plaintiff has made 'objectively rude, disrespectful, and insubordinate comments.'" *Id.* The Court

---

[11] Plaintiff essentially alleges an opposition claim, where he asserts that he "engaged in protected activity when [h]e opposed a violation of Title VII." *McGruder v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, No. 3:17-CV-01547, 2020 WL 4586171, at *4 (M.D. Tenn. Aug. 10, 2020) (other citation omitted). The parties do not dispute that Plaintiff engaged in protected activity, and the Court has already determined that Plaintiff has established a prima facie case. "Protection attaches if the manner of opposition is reasonable and is based on a reasonable and good faith belief that the challenged conduct is unlawful." *Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 600–01 (S.D. Ohio 2014), *aff'd sub nom. Sharp v. Profitt*, 674 F. App'x 440 (6th Cir. 2016). "An employee is not protected when he violates legitimate rules and orders of his employers." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). "While the means of opposition have been narrowly construed, the lawfulness of the employment practice has been broadly construed." *Id.*

found, "The district court erred by making this subjective determination."  *Id.*  The Court further

reasoned, "At the summary-judgment stage, we cannot accept an employer's conclusory claim that

an employee was insubordinate when the alleged 'insubordination consists of refusing to cease

what a jury could find to be reasonable [Title VII] protected activity.'"  *Id.* at 652 (quoting

*Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998)).  The Court further explained:

> Moreover, not all "insubordination" is treated equally. We have long
> held that an employer has legitimate cause to discipline or terminate
> an employee who refuses to follow through on an employer's
> expressed directions. *See, e.g., Fullen v. City of Columbus,* 514 F.
> App'x. 601, 606 (6th Cir. 2013); *Russell v. Univ. of Toledo,* 537
> F.3d 596, 604 (6th Cir. 2008). There is a difference, however,
> between a refusal to follow an order and an assertion that an
> employee was "rude" or "defiant." Indeed, there may be some
> instances when the allegedly insubordinate act may be a response to
> a sort of unspoken, subliminal discrimination in the workplace. For
> example, a woman who takes a strong position may be considered
> "pushy," whereas a man who does the same is "assertive." One
> manager may call a black man "aggressive" and a white man
> "passionate" for the same speech. These are just a few examples of
> how subjective these adjectival labels can be. And whether these
> adjectives are evidence of discrimination or are legitimate grounds
> for termination requires examining the words in context and the
> demeanor of the speakers—quintessential jury functions.

*Id.*  The Court noted that while the manager cited comments showing insubordination, the

comments also occurred when plaintiff asserted his discriminatory complaints.  *Id.*  The Court held

that a reasonable jury could find that plaintiff was not insubordinate, and therefore, summary

judgment was not appropriate.  *Id.*  The Court also concluded that a reasonable jury could find that

plaintiff's behavior was not as bad as to warrant termination because plaintiff consistently

performed well and his behavior only became a problem after he complained that his manager

created a hostile work environment.  *Id.* at 653.

    The Court agrees with Defendant that the facts in *Yazdian* are different than the facts

presented in this case.  In *Yazdian*, the Sixth Circuit called defendant's claim of insubordination

36

"conclusory" and further highlighted the different accounts of what the defendant concluded was insubordination. *Id.* at 652. Here, Plaintiff does not dispute that he was insubordinate. Plaintiff acknowledges that when Captain Johnson asked him to remove the patch, he refused. Next, Lieutenant Blair instructed Plaintiff to remove the patch, and Plaintiff refused to remove it. Plaintiff testified that he told Lieutenant Blair that if Major Pilgrim wanted Plaintiff to remove the patch, she needed to ask Plaintiff herself and not send someone else to instruct him to do so [Doc. 21-1 p. 91]. Captain Johnson then instructed Plaintiff to remove the patch a second time, and Plaintiff again refused. *Yazdian*, 793 F.3d at 652 ("We have long held that an employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions."); *see generally Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (explaining that not all opposition is protected activity) (other citation omitted). Unlike *Yazdian*, there are no varying accounts of communications as Plaintiff acknowledged during his deposition that the majority of the factual narrative in the June 26 Written Warning accurately described his conduct on June 20, 2019 [Doc. 21-1 pp. 101–02].[12]

While Plaintiff maintains that he was merely opposing purported discrimination, courts have recognized that not all opposition activity is protected. *Booker*, 879 F.2d at 1313. The opposition clause "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Armstrong v. Index Journal*, 647 F.2d 441, 448 (4th Cir. 1981). The Sixth Circuit has explained, "An employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his

---

[12]     The June 26 Written Warning states that management provided Plaintiff a copy of the Policy, but Plaintiff disputes this statement. [Doc. 21-1 pp. 101–02]. In addition, Plaintiff testified that the June 26 Written Warning omitted Macklin's statements that Macklin needed to research the law and Plaintiff disagreed with the characterization that his behavior was "disruptive," stating that Macklin ultimately issued the stand down [*Id.* at 102].

37

employer's goals." *Booker* at 1312. In determining whether an employee's opposition was reasonable, "courts are required 'to balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel. . . . The requirements of the job and the tolerable limits of conduct in a particular setting must be explored.'" *Id.* (quoting *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976)).

The Court has considered Plaintiff's job requirements and the particular setting where he worked. As Defendant explains, Plaintiff "is a PFO acting pursuant to DOE's statutory authority" to protect special nuclear material, and he disobeyed three orders from his superiors to remove the patch [Doc. 21 p. 25]. Both Stone and Macklin testified about the importance of PFOs obeying orders. Stone explained that security organizations expect employees to obey an order, even more so here given that PFOs are armed and have access to deadly weapons [Doc. 21-1 p. 4]. Macklin explained that PFOs are expected to display good order and discipline and to follow supervisors order because not doing so is disruptive to efficient operations [*Id.* at 149]. Plaintiff acknowledged during his deposition that if a PFO refused to obey an order, such could be disruptive to efficient operations [*Id.* at 103]. During the June 7 incident, management told Plaintiff to file a grievance if he felt the policy was wrong, but Plaintiff continued to refuse orders [*Id.* at 132]. The Court finds under the circumstances of this case, there are no genuine issues of material fact establishing that Defendant's reason was pretextual. *Equal Emp. Opportunity Comm'n v. Mike Hooks, Inc.*, No. 2:09 CV477, 2011 WL 1807369, at *17 (W.D. La. May 11, 2011) ("Even well-intended opposition activity is unprotected when it places the employee's loyalty and cooperation to her supervisor in doubt.").

Finally, Plaintiff states that while Defendant imposed discipline on him six days later, it waited almost five months to respond to the request for accommodation. Plaintiff has not cited any authority that a delayed decision to respond establishes pretext, especially given that the alleged retaliatory action (*i.e.*, the June 26 Written Warning) occurred before the delayed response. Accordingly, the Court finds Plaintiff has not established his burden by showing that Defendant's legitimate reason was merely pretextual.

## V. CONCLUSION

Accordingly, for the reasons explained above, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment [**Doc. 18**] and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment [**Doc. 20**]. There being no further issues in this case, the Court will enter a separate judgment closing this matter.

ORDER ACCORDINGLY.

Debra C. Poplin
United States Magistrate Judge